ready for our last case for the day. Good morning, Your Honor. I'm not sure whether you wanted to start the argument or whether you wanted to address the motion first. Yes, we want to address the motion first. And what we're trying to do. Obviously, we want to be very careful as we must and not trespass on anything that we shouldn't talk about in court. But is it your motion and the government didn't take a position. But can we get into the substance of this argument without doing that? I mean, in other words, if we respect what's sealed, will we have enough that can be spoken openly? There could be enough to have this argument. Well, it's sort of ironic because our position is we would prefer that the argument be open. My client and his family would like to listen to it. However, this is an extremely fact intensive case about a corrupt ex officer. And it involves evidence that I need to be able to discuss. So if the government and the court is okay with me discussing the evidence openly, I certainly have no objection to leaving this and would prefer to leave this argument open. But I do want to be free to be able to discuss the grand jury testimony, the FBI investigative reports. There's a lot of evidence, and this is a fact intensive case government. Mr Martinez, what's your position on that? The council did by the best she could. She said my drugs is go open, but she's respecting the government's position. What is your position? Your Honor, I'm confident that we can responsibly discuss what's in both the sealed and unsealed versions of the joint appendix appendix on a public record. There were several references to sealed materials during oral argument before Judge Hollander below. So to that extent, I don't know exactly what Miss Levy's gonna say, but I expect that what we do have to say is a matter of public record in any event. All right, well, that's fine with you, Miss Levy. As long as there's no restriction on my discussing the evidence, I'm perfectly happy leaving this open. No, right, it's fine. And what we'll do since everybody I think is being in good faith trying to do this, Mr. Martinez, if at some point we do get into something that you didn't anticipate and now have a different view of it, I'll allow you to, you know, to raise some questions and then we might be able to look at that. But otherwise, I'm going to say you both have the rank based on your representation of your position. We argue the case as you would like and as your counsel would. That's good enough? Is that fine? Mr. Martinez? I appreciate that, Your Honor. Thank you. All right. Okay, then. Thank you very much. It's pronounced, is it Lovie? Yes, Lovie, Your Honor. Thank you. May it please the court. I'm Deborah Lovie from the Exoneration Project on behalf of the appellant, Keon Paylor. The criminal charges that Mr. Paylor pled guilty to were 100% reliant on allegations made by a convicted ex-Paltimore police detective, Daniel Hursle. Hursle's corruption ran deep and his modus operandi was exactly what Mr. Paylor has been alleging since long before his guilty plea, that the gun was a plant and that Mr. Paylor was framed so that the officers could steal thousands of dollars from him. The government's position throughout Hursle's prosecution was that Hursle's misconduct began long before 2014 and that's how he amassed 1,700 discredited convictions. The government's position before the grand jury was that Mr. Paylor was framed by Hursle, notwithstanding his guilty plea. And the government's position before the district court in the Rule 35 motion was that Mr. Paylor's grand jury testimony provided the government with material assistance that he had testified truthfully. The government's new position here, after the government vouched for Mr. Paylor repeatedly and used him to secure the superseding indictment against Hursle, must be rejected. Hursle's rampant misconduct clearly predated Mr. Paylor's guilty plea and under United States v. Fisher, Mr. Paylor should be allowed to vacate his guilty plea. And what do you base your statement on that Hursle's rampant misconduct clearly predated the guilty plea? Sure. Well, there are a number of things that the court can look to. First of all, the first one is that Mr. Paylor pled guilty in April of 2015, which is months after Hursle's first convicted offense, the Jimmy Griffin, which occurred in November of 2014. And then the government argued throughout the prosecution numerous times that Hursle's misconduct had been years in the making. They specifically argued, because 2014 was significant in their case as well, that his misconduct predated 2014. Even Hursle's own lawyer talked about it spanning his entire career. These claims in the case are corroborated by counsel's in the discovery, by all the media reports cited in the brief, by the fact that Hursle's indictment was only two years after Mr. Paylor's and he had amassed 1,700 dirty convictions. It would be hard to imagine you could amass 1,700 bad convictions in a two-year time span. You'd be hard-pressed to do it, I believe. And that's why I'm happy to share with the court some of the things that the prosecutor had to say about it. The prosecutor made it pretty clear that they were looking pre-2014. If you look at the record at JA 1718, the prosecutor talks about making the choice between criminal conduct in respect to the badge and says that Daniel Hursle did that sometime prior to 2014. They talk at 1715 about how Hursle's conduct occurred before he joined the GTTF. He was robbing civilians with the talks about him robbing people before he joined the GTTF. And there are numerous sites that are included throughout my brief. The government's position all along has been that this was rampant and long before. But obviously, if there's any question at all about the timing, then that just underscores the need for discovery and an evidence-based inquiry. We don't think there's one- Ms. Lovey, you asked for discovery below. What kind of discovery would you be looking for? Well, in the hearing below, only four-and-a-half of the IADs were disclosed, which was not enough to show the 1,700 convictions that have been compromised by Detective Hursle's involvement. If this court had any question about the timing of his corruption, we would be asking for all of the IADs involving Hursle's, whether they were sustained or unsustained. And that's why there was such a deficiency below, was because the court was only giving sustained convictions or sustained complaints. But we'd be asking for all of them with an opportunity to then set up the parade of people who were victimized by this clearly corrupt officer to show that this did predate Mr. Poehler's guilty plea. But in Mr. Poehler's case, doesn't the interview of Mr. Harris corroborate what the officers said happened here? Several responses, Your Honor. First of all, Mr. Harris was- this was an interview. This is not testimony, although the government likes to refer to it as testimony. This is just hearsay of an interview of what Mr. Harris supposedly said. But Mr. Harris was in a different part of the house. He was out of view of the stairs going up. He was with a small child. There were four officers. There was a lot going on. There was an arrest that happened. And Detective Hursle, in his proffer, in his own criminal proceedings, admitted that an officer went upstairs. So the fact that Mr. Harris didn't see an officer going upstairs according to the hearsay report of this one government report is not at all dispositive. Hursle's own admissions take you to at least an officer went up. And he originally- And his mother would point to the fact that an officer went upstairs because she, at some point, said the clothes were lying everywhere. Absolutely. And let us not forget these contemporaneous phone calls. I urge the court to listen to them. Phone call after phone call after phone call was saying to his family, these are dirty cops. They went upstairs. They took my money. This was a frame up. He had nothing to gain by making these claims. It's preposterous to think that he was planning ahead years in advance for how this might somehow help him. And in fact, when the government tried to offer him something to gain, he was so afraid of former Detective Hursle that he declined. He chose to serve out the remainder of his sentence rather than take a reduction in his sentence because he was so terrified of these officers. So these phone calls have real, they're very compelling. And he talks about- I understand that here you're, or today you're arguing about all the bad conduct prior to the plea. But I understood, as I read your brief, I understood you to be arguing that the guilty plea would have been different if appellant had had evidence of Hursle's misconduct in the years between 2014 and 2018. Am I reading that wrong? Yes. And I apologize if the brief wasn't clear on that point. Before Mr. Paler pled, he had a strong hunch based on all the media reports and what defense councils around the county knew that Hursle was a dirty cop. And he knew it from his own experience, but he couldn't prove it. And without the proof, without the evidence to show, he was forced to plead guilty because that's how Hursle picked his victims. These were vulnerable people who would never be credited in a swearing match against the respected detective. Had he had this information before he pled guilty, he wouldn't have pled guilty. And that's what Fisher gives you. Fisher talks about there's this uncommon case where there's something so egregious that happened that we should allow the vacature of a guilty plea because it was material to the decision to plead guilty. And you had defense council talking about, you had defense council's efforts to get the information on Hursle, his, you know, affidavit and Paler's accounts that they never would have pled if they could have gotten the evidence of Hursle's misconduct. Hursle certainly knew what his modus operandi was. That's imputed to the government. He knew he constantly had coordinated plans with the other officers. This is what he did. He framed suspects. He planted evidence and he stole their money. And if Mr. Paler could have had that information, he never would have pled guilty. And that is what the case of Fisher is designed to address. That uncommon situation where you have something that really goes to the heart of the prosecution as this one did. This would have been, you know, 404B evidence of modus operandi of a coordinated plan regardless of whether or not Hursle testified at trial. It would have gone to the heart of this case. And I think the real proof is if this court were to allow Mr. Paler to vacate his plea, does anyone think for a second that the government's going to try and re-prosecute him? Of course not, given how dirty this cop was and how this fell into exactly what he was doing. And that's how we know this is evidence that goes to the absolute heart of the case. The government vouched for Mr. Paler in order to get the superseding invitement and then they threw him under the bus. Judicial estoppel, all notions of fairness, United States v. Fisher, all of those things. So I think there's a lot of support that Mr. Paler should be allowed to vacate his plea. If the court doesn't have any remaining questions, I'll save the rest of my time for rebuttal. All right. Thank you, Ms. Muehle. Mr. Martinez? Good morning, your honors, and may it please the court. Peter Martinez for the United States. Keon Paler is guilty. His guilty plea was knowing and doesn't change that. I want to emphasize two facts right off the bat that dispose of Paler's claim under Fisher. First, the timing. The record shows that with one exception, every known instance of criminal misconduct by Herschel happened after Paler's guilty plea. The only exception... How do we know that? How do we know that? If there wasn't an evidentiary hearing and the appellant was only given four and a half of the complaints against Herschel? Your honor, all of the IED material pertaining to all of the law enforcement officers in this case was provided to Judge Hollander prior to Mr. Paler's plea. At the time, Judge Hollander... Right, Judge Hollander. Do we have all of that in the record? I believe... Does the appellant have all of that? No, your honor. I don't know how you can say that he had everything. Judge Hollander, at the time she reviewed our in-camera submission, had a letter from defense counsel in which he laid out his theory of the case, Paler's allegations about what happened with respect to this arrest. There was also a discovery conference, a telephone conference, in which counsel laid out his theory and made his pitch to Judge Hollander as to why he should have been the one to review the files as opposed to her. Judge Hollander knew what the theory of the case was. She reviewed all of the IED material with respect to all four officers. And she was conservative, or the district court was conservative in what the court turned over at that time out of concern for complaints not necessarily being sustained. Now, those 30 the district court was conservative, but now 1,700 bad complaints later, perhaps those complaints are sustained. So I would like to understand from the government the question the district court asked at that hearing was, how can appellant show conduct predating his case if you don't turn over anything as to what you have that might have predated his case? Well, Your Honor, we can't go back and redo discovery now that there's a final guilty plea on the books. We did exactly what Paler asked us to do in this case. I guess we can now in an evidentiary hearing, which is what they're asking for. That is if we conclude that Fisher warrants relief here. And I would submit just in response to one of the concerns Your Honor just raised in terms of whether Judge Hollander was generous or not, it's not accurate to say that the only Not generous. The district court was being conservative as the court itself expressed, and understandably so at that point. We're at a different time now. I understand. We know better now. The factual point I'm trying to make is that the four and a half IAD complaints she turned over, they weren't simply the universe of sustained materials. In fact, the complaint involving Mr. Racketeering indictment against Herschel, where the jury returned a guilty verdict, that was a pending complaint at the time. So that shows that Judge Hollander didn't limit the disclosures simply to sustained complaints. It shows that she took counsel's theory of the case into account and was sensitive to what the issues were going to be in the trial. Regardless, Your Honor, I would still submit that above and beyond the timing issue, we have the nexus to Paler's case, and that's also required under Fisher. And the record shows that every known instance of criminal misconduct by Herschel happened in other cases. And that Mr. Paler can't point to any evidence other than his own allegations that there was any misconduct in Well, let me ask you this. In the government's view, was Mr. Paler's testimony at his plea hearing the truth, or was his testimony at the grand jury that the government put on the truth? Very much the former, Your Honor. So the government put on testimony in the grand jury that was not truthful? Your Honor, Mr. Paler testified in the grand jury immediately after meeting with the GTTF investigators for the first time. He was in Baltimore on a rip from his BOP facility, and my colleague interviewed him and put him in the grand jury on the same day. Okay, so they can't both be true. What he testified to at the plea hearing, um, that was my gun, is at odds with what he testified to in the grand jury. That was not my gun. Which is the truth in the government's perspective? His sworn admission of guilt is the truth. His grand jury testimony is false. All right, all right. So then the government did suborn perjury in the grand jury? Your Honor, it's certainly true that we as prosecutors have an obligation not to knowingly suborn perjured testimony. It is also true that the grand jury is an investigative tool, and that we often put witnesses in the grand jury while we are still, and the grand jury is still, vetting the reliability. Well, I don't think you put witnesses in the grand jury knowing that, um, they're... He pled guilty, and the government knew that. So the government had to think that what he was saying in the grand jury was true, and what he said at the plea hearing was not true. I'm not going to speak to, uh, the mental state of the prosecutor who put Paler in the grand jury. I will... What about the prosecutor or the government, um, actors that then made a motion on his behalf indicating that it was true and helpful, his testimony in the grand jury? Your Honor, that Rule 35 motion was made shortly after Paler's grand jury testimony, before we had an opportunity to fully investigate what he was claiming, uh, and we had an obligation to do that. We had an obligation to get to the truth, and we did. As I, um, as you mentioned in, uh, Ms. Levy's argument, uh, we interviewed Paler's stepfather, Stuart Harris. You didn't... You didn't... The government didn't feel an obligation to get to the truth before it put somebody in the grand jury under oath to say something completely opposed to what he had pled guilty to? Your Honor, they were... The investigators who put Paler in the grand jury were doing that in the context of an ongoing investigation. They were using the... Wait, you're saying an investigator put him in the grand jury. Was there not a prosecutor in the grand jury asking those questions? Indeed, there was, Your Honor. It was... Okay. And I would point out that the grand jury that heard Paler's testimony didn't include his allegations in the superseding indictment against Herschel and two others. His allegations weren't mentioned at Herschel's trial or sentencing. He wasn't called to testify, uh, in either proceeding. And I was just explaining to the court that following his grand jury testimony, we interviewed Mr. Harris. Mr. Paler's counsel brought Stuart Harris to that interview. They were in the room for the interview. And during that interview, he eviscerated the testimony Mr. Paler gave before the grand jury. He said that the officers were in and out of the house. He said that he didn't see or hear anyone going upstairs and that he would have heard it from where he was standing in the kitchen. He said that nothing was out of place, including in Paler's bedroom when the officers left the house. He said that the police executed the house of the search warrant in 2010 and recovered two firearms then as well. He claimed he remembered that Paler admitted possessing those firearms. That's important. Mr. Paler testified... Who is this that said all this? This is Mr. Paler's own stepfather, the only civilian... All right, what about his, his, his mother and Mr. Paler himself? Mr. Paler's mother was not in the home for the arrest. There's no evidence of that in the record. I don't think that's a disputed fact. There, there is no evidence... She was in the home immediately after and saw the clothes strewn about the bedroom floor and the money missing. I don't believe that's true, Your Honor. I think that Mr... You don't know. Maybe if we had an evidentiary hearing, we would know. Well, there's no evidence of that. The stepfather was... Right. There were no other, other than a small child, the only individuals present for the arrest were the stepfather, the small child, and Mr. Paler. The mother was simply not there. So... Does the government not share at least my concern that the government has talked out of both sides of its mouth on this case, a case that involves already a dirty cop? This just doesn't seem in the interest of justice. Your Honor, I will come back to what I said a moment ago. And that is that at the time of Mr. Paler's grand jury testimony, and at the time of the Rule 35, we hadn't had the opportunity to fully investigate what he was claiming. And we did that. I just went through the interview of Mr. Harris. The ATF interviewed Detective Romeo, who remembered seeing with Paler with a gun and didn't remember anyone going upstairs. He hadn't been spoken with at the time of the grand jury testimony by Mr. Paler. And yes, the FBI interviewed Detective Hursle, who admitted to misconduct in other cases, but not in this one. And the suggestion that Hursle admitted misconduct is just... That's a distortion of the record. Both judges, Hollander and Bernard, concluded below that there was no admission by Detective Hursle of officer misconduct at the scene. So, Your Honor, it is our office's position that knowing what we know now, if we had to do it over again, we wouldn't make the Rule 35. And that's because every piece of intrinsic evidence that's come to light following Paler's grand jury testimony supports his convictions, both in 2015 and in 2010. The evidence shows that he's guilty and the testimony before the grand jury was false. And so I don't think it's unfair or that it's gamesmanship for the government to be defending his conviction in this appeal. To the contrary, what Mr. Paler is asking this following his grand jury testimony of the Rule 35. And that any further investigation that undermines his claim can't be considered by this court. But of course it can. There's no dispute. Mr. Paler's lawyers were present when his own stepfather destroyed the credibility of the testimony he gave before the grand jury. So in that sense, knowing what we know... How do you know his stepfather's credible? Because he had no reason to lie, if anything. How do you know? Well, he is... Your Honor, there's no reason to believe that he wasn't telling the truth. I have no evidence impeaching his credibility. Well, the government hasn't been the best judge of who's telling the truth in this case so far. I think the government... I think what the record in this case shows is that the government made great efforts to get to the truth. And that following Mr. Paler's grand jury testimony, we continued to kick rocks over to find out what happened. Had Mr. Harris' testimony gone the other way? Had he come in... What if the Rule 35 motion had gone through? What if Mr. Paler had not been so intimidated by the police that he accepted the Rule 35 motion? What if the Rule 35 motion had been granted? Then what would the government have done? If the motion had gone through, Your Honor, we still would have done the investigation that we did to get to the bottom of what he was claiming. We still would have reached a determination based on the facts, the testimony he gave the grand jury. After you already made the Rule 35 motion? Yes, because we had an obligation... The motion that he was helpful and truthful before the grand jury wasn't... The facts weren't determined on that before the government made the motion? Well, I know that the Rule 35 would have prevented him from filing this motion to vacate. And once he filed the motion to vacate, and we realized that he had said what he said in the grand jury, and that there was a civilian witness who law enforcement had not talked to yet, we said, we better get to the truth of this. We better kick that rock over, whatever may be underneath it. And had Mr. Harris' interview gone the other way, and had he corroborated Mr. Poehler's allegation, then Mr. Poehler might have had a Fisher claim. We might have conceded relief, but that's not what happened. Mr. Harris didn't support Mr. Poehler's account. He discredited it. So that is what I'm referring to, Your Honor, when I say that every piece of new intrinsic evidence that has come to light following Mr. Poehler's grand jury testimony supports his conviction. And I just, I want to circle back to a point I'd like the court to keep in mind. I want to talk about what this case is not about. We don't deny or minimize that Daniel Herschel committed serious crimes, but the case against Mr. Poehler didn't depend on Herschel. Poehler's guilty plea wasn't, as counsel has suggested, simply an acceptance of Herschel's version of events. By the time Poehler entered his plea, we told defense counsel that we wouldn't be calling Herschel as a witness. And it was after that that Mr. Poehler stipulated that had there been a trial in this case, the government would have proven beyond a reasonable doubt that he possessed a gun. And we'd have proven his guilt by calling three other officers, none of whom, despite Mr. Poehler's attempts to muddy the waters on this, have been implicated in any wrongdoing. Our case might also have included extrinsic evidence that Mr. Poehler possessed two guns at his house in 2010. We filed a motion to admit that evidence under Rule 404B, and it was pending at the time of the plea. So Mr. Poehler knew and admitted in 2015 that Herschel was a sideshow, and that the government would have made its case, beyond a reasonable doubt, without him. The other thing I'd like to emphasize to the court is what Fisher actually says. In order to set aside his plea under Fisher, Mr. Poehler has to show egregious police misconduct that predated his guilty plea and underpinned the charges against him. And we've talked about the timing issue, Your Honor, but I also want to talk about the underpinning or intrinsic misconduct requirement. And that's absolutely... Mr. Martinez. Yes, Your Honor. Here you're arguing that Mr. Poehler is not entitled to this because we could have done all this without Herschel being involved at all. Well, if that's the case, why did you find it necessary to use him for the grand jury to get an indictment? You would say based on that there's nothing you'd know about him at all that would be really of any moment to his complicity in anything, right? I'm sorry, I don't think I understand the court's question. I'm asking you why was it necessary to have him since you said in terms of what he would have observed, what was it about that he said about Herschel was that important then in this case? What part of it? Because you said you wouldn't have called Herschel anyway. What part of it, what part of Herschel's involvement in this case would have been important that Poehler could have testified or did testify? Well, Herschel was part of the arrest team and clearly we've known from the beginning of the case way back in 2015 that Mr. Poehler has been making allegations that Herschel engaged in misconduct. What was the misconduct that day? On the date of Mr. Poehler's arrest, Your Honor? Yes. What was the misconduct? Mr. Poehler has alleged, contrary to his sworn statements during the guilty plea, that well that another detective stole money and that the firearm the officers recovered from the seat cushion on his front porch was not his. You evade my question. I'm saying what did he, what is Herschel's involvement individually? What did he do? What did he do with respect to Mr. Poehler's arrest? Yeah, that was wrongdoing. There was no wrongdoing by Herschel in this case. That is our position. So, so, so then, then so in the grand jury, he testified to no wrongdoing on Herschel's part at all. I, Mr. Poehler's grand jury transcript is certainly not a model of clarity. He claims in the transcript that another officer went upstairs and stole money, that much is clear. He said nothing about Herschel at all? Nothing else you represent to the court? He made claims about Herschel arresting him in other cases and he said that Herschel was among the group of officers who arrested him in this case. He did not allege that Herschel stole his money. He did not allege, he didn't allege that any particular officer planted the firearm. I don't think he even alleged, I don't think you can read the transcript to suggest that he alleged the firearm was planted. He simply claimed it wasn't his. But before your honor's question, I was talking about Fisher's requirement that the misconduct underpinned this case, and I don't think you can read that requirement out of the Fisher opinion. Whatever word you use, whether it's underpinning, intrinsic, or some other term, it is clear that what drove the analysis in Fisher was that the misconduct happened, the law enforcement misconduct happened in connection with the defendant's case. And in that case, the task force officer had a search warrant affidavit for the defendant's residence, which led to the discovery of the only evidence against the defendant in this case, in that case. We've cited a long list of cases at pages 38 and 39 of our brief in which district courts throughout this circuit have limited to Fisher to misconduct in the defendant's underlying case. Your honor, there's no, Mr. Poehler cannot satisfy that underpinning requirement. He can't point to any intrinsic evidence of officer misconduct other than his own allegations, which he's, of course, been aware of all along. During her argument, Ms. Lobey tried to manufacture an allegation of extrinsic misconduct by claiming that Herschel admitted that another officer went upstairs and stole money. Judges Berdar and Hollander both considered that argument below and concluded that it's wrong. There's only one interview during which Herschel talked about Mr. Poehler's arrest. The 302 of that interview is at page 1423 of the joint appendix. And it's clear from that 302, Herschel said he never saw Sergeant Burns stealing money, never suspected him of stealing money. I don't know why we should believe anything Herschel says at all at this point. Well, your honor. Why are you relying on Herschel for anything? Ms. Lobey's relying on him as having admitted something. And the 302 memorializing that interview flatly contradicts that. Right. I'm sure there were 302s and reports in the 1,700 other cases that he engaged in misconduct in. I just don't understand why the government would rely on him for anything at this point. We are relying on the fact that the... Or vouch for him. It's not vouching for former FBI agent memorializing in his interview accurately reflects what was said. That's the point I'm making to the court. All right. That's fair. And so Mr. Poehler, the fact remains that he can't come up with any new intrinsic evidence of misconduct in this case other than his own allegations. And for that reason, his claim under Fisher fails. And so for all the reasons I've mentioned this morning, we'd ask the court to affirm Judge Hollander's 2255 in this case. Thank you, Mr. Martinez. Ms. Lobey. Thank you. Briefly, your honors, the government cannot escape. This case is absolutely dependent on Herschel and the efforts to run away from Herschel here should be disregarded. I just want to remind the court to take a look at the sites in the government statement of fact. Only thing they are relying on to accuse Mr. Poehler of anything is Herschel's probable cause affidavit to Herschel's police reports, the plea agreement drafted by Herschel, or based on what Herschel said. The only other officers who have gone on record are Burns, who did not see a gun, Romeo, who contradicted what Herschel said, and we've never heard anything from Moore. So this case, whether or not Herschel testifies, is reliant on Herschel. This would be 404B evidence. Is Herschel the only one that did a report, correct? Yes, he is the only one who did a report. This case is absolutely his. It hangs on him. The second thing I'd like to talk about briefly is that this court has been very interested about evidentiary hearing and counsel for the government keeps disputing the evidence. I want to remind the court that if this court is considering an evidentiary hearing, that unless the motion and the files and records of the case conclusively show that he's not entitled to relief, an evidentiary hearing was required, and the facts have to be viewed in the light most favorable to the 2255 movement for that adjudication. So if there are remaining questions about the IADs or anything else, there should have been an evidentiary hearing. With that said, the government's reliance or misconstruction of the evidence, I would dispute highly. Mr. Harris does not undermine Mr. Poehler's withdrawal of his plea. He was clear that the officers were in for 10 minutes, which is certainly more than enough time, and Herschel's proffer did admit that an officer went upstairs. It didn't just admit that an officer stole money, but it admitted that an officer went upstairs, which contradicts his police reports, which is not mentioned in his police report, and certainly given all the modus operandi evidence of him working in concert coordinated plans to do this, is sufficient here. Lastly, I just point out that the IADs that the district court gave Mr. Poehler were woefully insufficient. The court only had any knowledge about what a corrupt officer they were dealing with, and it only considered sustained reports. Even the district court sounded remorseful about how limited the discovery was in this case. We would ask that Mr. Poehler be allowed to vacate his plea, and at a bare minimum, if the court isn't ready to do that, that he be granted discovery and an evidentiary hearing. Thank you. Thank you, Ms. Lovey and Dr. Pines. We would love to come down and greet you in our normal tradition, but we cannot do that, but know that we very much appreciate your arguments in the case, and we hope that you will be safe and continue to be well. Thank you so much. With that, I'll ask the deputy clerk to adjourn the court for until this afternoon. Thank you. Honorable court stands adjourned until this afternoon. God save the United States in this honorable court.
judges: Roger L. Gregory, Henry F. Floyd, Stephanie D. Thacker